## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re<br><br>**INCREDIBLE AUTO SALES LLC**,<br><br>      Debtor. | Case No.  **06-60855-11** |
| **AUTO AUCTION ASSOCIATES OF MONTANA, INC. d/b/a AUTO AUCTION OF MONTANA**,<br><br>      Plaintiff.<br><br>-vs-<br><br>**INCREDIBLE AUTO SALES LLC, and HYUNDAI MOTOR FINANCE COMPANY, as intervenor**,<br><br>      Defendants. | Adv No.  **06-00119** |

## MEMORANDUM  OF  DECISION

At Butte in said District this 26th day of March, 2007.

Plaintiff, Auto Auction Associates of Montana, Inc. d/b/a Auto Auction of Montana ("AAM"), represented by Bruce F. Fain ("Fain"), of Billings Montana, filed this adversary proceeding on October 18, 2006, alleging reclamations claims under 11 U.S.C. § 546(c).   On November 3, 2006, this Court granted Hyundai Motor Finance Company's ("Hyundai") motion to intervene as a Defendant.  This Court entered a default judgment against Incredible Auto Sales LLC, on January 17, 2007.  The Court set this proceeding for trial on February 26, 2007.  On

1

February 22, 2007, AAM and Hyundai, represented by Shane P. Coleman ("Coleman"), filed a

proposed pretrial order, which this Court approved.  The parties filed pretrial memoranda.  At the

trial on February 26, 2007, the following witnesses testified:  Nick Gutierrez, Ken Cornelison,

and Nels Pearson testified.  Plaintiff's Exhibits ("Pl. Ex.") 1 through 10 and Defendant's

Exhibits ("Def. Ex.") 1 through 6 and 24 through 29 were admitted pursuant to the approved

pretrial order.  This proceeding is ready for decision.  This memorandum of decision contains the

Court's findings of fact and conclusions of law.

## FACTS

In addition to the testimony presented, which follows after the stipulated facts herein, and

the exhibits admitted at trial, the parties agreed in the approved pretrial order to the following

facts:

> 1. This Adversary Proceeding involves a dispute between a reclaiming seller of
> used vehicles, Auto Auction Associates of Montana, Inc. ("AAM"), and the
> Debtor's floor plan lender Hyundai Motor Finance Company ("HMFC"). AAM
> sold certain used "Subject Vehicles" (described herein) to the Debtor Incredible
> Auto Sales, LLC ("Incredible") pre-petition. HMFC holds a security interest in,
> *inter alia*, all of Incredible's used vehicle inventory. AAM seeks to reclaim the
> Subject Vehicles. HMFC assets that its security interest in inventory is superior to
> AAM's reclamation rights.
>
> 2. This Court has jurisdiction over this adversary proceeding pursuant to 28
> U.S.C. §§ 157 and 1334, 11 U.S.C. § 546, and Fed. R. Bank. P. 65.
>
> 3. This is a core proceeding pursuant to 28 U.S.C. 157(b)(2)(A) and (b)(2)(E).
>
> 4. Venue is proper pursuant to 28 U.S.C. § 1409(a).
>
> 5. AAM is a licensed automobile company and a creditor and/or interested party
> and has standing to bring this action pursuant to 11 U.S.C. § 546(c) and Fed. R.
> Bank. P. 7065.
>
> 6. Incredible is a retail and wholesale dealer of automobiles and the Debtor in the
> above-captioned Chapter 11 case.

2

7. As of the date of filing of the petition in this case, Incredible's principal place of business is 1832 King Avenue West, Billings, Montana 59102.

8. HMFC stopped new car financing to the Debtor in September of 2006 after receiving a tip about possible double flooring.

9. After September of 2006, HMFC continued to floor used cars, but had transaction documents examined by an analyst before agreeing to floor any used car purchases.

10. HMFC representatives made at least two trips out to Billings to examine the Debtor's operation prior to the filing of bankruptcy.

11. In early October of 2006, Incredible purchased the Subject Vehicles through AAM.

12. The Subject Vehicles received by Incredible are identified by sale date, vehicle year, vehicle make, vehicle model, partial VIN, as follows:

| Year | Make | Model | VIN | Purchased from AAM | Floored by Hyundai | Re-Sale Price |
|------|------|-------|-----|--------------------|--------------------|---------------|
| 2004 | CHEVY | BLAZER | 1GNDT13X74K163169 | 10/05/2006 | 10/05/2006 | |
| 2005 | PONTIAC | MONTANA | 1GMDV23E75D121917 | 10/04/2006 | 10/04/2006 | $9,150 |
| 2004 | FORD | RANGER | 1FTZR44E34PA07225 | 10/03/2006 | 10/03/2006 | $8,050 |
| 2005 | CHEVY | CLASSIC | 1G1ND52F75M177176 | 10/05/2006 | 10/05/2006 | $6,850 |
| 2003 | CHEVY | MALIBU | 1G1ND52J93M699843 | 10/05/2006 | 10/05/2006 | $5,350 |
| 2005 | CHRYSLER | SEBRING | 1C3EL46X35N568587 | 10/05/2006 | 10/05/2006 | $7,900 |
| 2006 | KIA | SORRENTO | KNDJC733565573207 | | N/A | $13,200 |

13. Incredible paid for the Subject Vehicles with checks written to AAM. [Testimony by Nels Pearson stated that no check was tendered for the 2004 Chevy Blazer].

14. Incredible took physical possession of each of the Subject Vehicles. Each of the Subject Vehicles was taken to Incredible's retail lot and offered for sale to retail customers.

15. AAM delivered to Incredible original certificates of title for each of the Subject Vehicles, except for the 2004 Chevy Blazer.

16. Thereafter, the tendered checks for the Montana, the Ranger, and the Classic

were returned for insufficient funds. Incredible then contacted AAM and informed AAM that there would also be insufficient funds to pay the checks for the remainder of the Subject Vehicles and that the checks would be returned by Incredible's bank.

17. Incredible's principal, Nick Gutierrez, was to meet with the principal of AAM on October 17, 2006, in order to reach a resolution of this matter, but did not show and his counsel informed counsel for AAM of the bankruptcy filing which was made on October 17, 2006.

18. At the same time that Incredible purchased the Subject Vehicles from AAM (or within days thereof), Incredible also purchased other vehicles from AAM with NSF checks. As with the Subject Vehicles, Incredible gave checks to AAM, received original certificates of title for these other vehicles, and received physical possession of these other vehicles. These other vehicles were resold by Incredible to third-party customers pre-petition, in the ordinary course of Incredible's business. AAM has filed an application for an administrative expense for these other vehicles.

19. On October 17, 2006, AAM provided a written reclamation claim for a total of eleven (11) vehicles, including the Subject Vehicles, to Incredible, its counsel, and the United States Trustee.

20. When AAM sold the Subject Vehicles to Incredible, it did so in the ordinary course of business at a time when Incredible was insolvent, all of which occurred within forty-five (45) days of the commencement of the case.

21. AAM provided a timely written demand to Incredible for reclamation of the Subject Vehicles.

22. HMFC was Incredible's "floor plan" lender. HMFC holds a properly perfected security interest in, *inter alia*, "[a]ll inventory of new and used motor vehicles and other personal property held for sale or lease including, but not limited to, display or demonstration items, returns and repossessions, and all accessories and additions thereto." (HMFC Ex. 1.[1]) HMFC's security interest is evidenced by an Inventory Loan and Security Agreement, an Addendum, and three financing statements filed with the Montana Secretary of State's office. (HMFC Ex. 1-5.) AAM disputes that HMFC's lien rights extend to the Subject Vehicles.

---

[1] All references herein to Exhibits refer to the HMFC exhibits introduced and admitted during the December 5, 2006, hearing, unless otherwise noted. *See* Record of Exhibits Introduced (dkt. 114). Additionally, Exhibits 1-5 were also admitted at the November 6, 2006, hearing without objection. *See* Record of Exhibits Introduced (dkt. 50).

4

23. To receive floor plan advances to buy used vehicle inventory, Incredible was to first pay for the vehicle with its own money. Ueno Aff. ¶ 5 (attached to dkt. 164). When Incredible would receive signed certificates of title for the vehicles, Incredible would send those certificates to HMFC by facsimile. *Id.* HMFC would then advance Incredible funds. *Id.* HMFC would advance 80% of the purchase price of used vehicles purchased directly from a seller and 100% for vehicles purchased through an auction. Ueno Aff. ¶ 4.

24. HMFC advanced Incredible new money under the Inventory Loan and Security Agreement for each of the Subject Vehicles, with the exception of the 2006 Kia Sorento. HMFC Ex. 6. HMFC advanced funds on the same dates that the Subject Vehicles were purchased, as shown in the above chart. Before advancing funds, HMFC received from Incredible copies of signed certificates of title for each of the Subject Vehicles, except two. HMFC did not receive a fax of the 2006 Kia Sorento certificate of title, because no new money was advanced for its purchase. HMFC apparently received a fax of a photocopy of the 2004 Chevy Blazer certificate of title before advancing new money, because Incredible did not receive the original of that certificate of title from AAM. The faxed copy of the certificate of title for the 2004 Chevy Blazer is signed by Lalonna Seymour, an Incredible employee. *See* Ex. H24.

25. On December 7, 2006, AAM and HMFC filed a joint motion for relief from stay, asking that the Subject Vehicles be sold at auction and their proceeds be segregated, in order to minimize further depreciation of the Subject Vehicles. (dkt. 123.) The parties' substantive rights were unaffected by the sale of the Subject Vehicles. To the extent either party had rights in the Subject Vehicles, such party now has rights in the sale proceeds. On December 8, 2006, this Court granted the joint motion and ordered relief from stay. (dkt. 125.)

26. Thereafter, the Subject Vehicles were sold according to this Court's Order. In order to sell the Subject Vehicles, the certificates of title for each of the Subject Vehicles were returned from Incredible to AAM. The net proceeds received for each of the Subject Vehicles is stated in the above chart. The proceeds of all of the Subject Vehicles, except the 2004 Chevy Blazer, are held by AAM's counsel awaiting resolution of this adversary proceeding. AAM received proceeds from the 2004 Chevy Blazer but mistakenly failed to deposit those proceeds with the other proceeds of the Subject Vehicles. Proceeds from the sale of the 2004 Chevy Blazer should be included with the other proceeds in the segregated account, pending further action by this Court.

27. The net proceeds from the sale of the Subject Vehicles are insufficient to pay either AAM or HMFC the full amounts of their claims.

28. On January 17, 2007, this Court entered default judgment against Incredible, on AAM's motion. (adv. dkt. 20.)

29. The only issue remaining for trial in this adversary proceeding is whether AAM or HMFC is entitled to the proceeds from the sale of the Subject Vehicles.

The following facts were placed in the record during the trial on February 26, 2007.  Nels Pearson, controller of AAM, testified that the vehicles at issue in this proceeding are identified on Ex. 1.  He testified that Ex. 2, without the second page, is a copy of the "bought ticket" for the 2004 Chevy Blazer, VIN # xxxx 163169, indicating that no check was received from Incredible Auto.  He testified that AAM held the title for this Blazer and never transferred it to Incredible Auto.  He testified that for the Pontiac Montana, Ex. 3, AAM presented title, received a check but that it was returned for "not sufficient funds."  He further testified that for the Ford Ranger, Ex. 4, and the Chevy Malibu/Classic, Ex. 5, AAM presented titles, processed the checks and they were returned for not sufficient funds.  He testified that for the Chevy Malibu, Ex. 6, the Chrysler Sebring, Ex. 7, the Kia Sorrento, Ex. 8, AAM presented the titles, and as the other checks were returned for not sufficient funds, AAM never deposited the checks for the Malibu, the Sebring, and the Kia as reflected on Ex. 6, 7 and 8.  Except for the Chevy Blazer, Ex 2, AAM presented titles on all vehicles to Incredible Auto.  He further testified that pursuant to the agreements for sale, the sale is not completed unless AAM receives the funds from the buyer, in this case, Incredible Auto. He stated that on the back of the "bought" ticket, the terms thereon state that a sale is not completed until AAM is paid.  He stated AAM receives bank information from every qualified buyer on an annual basis and that AAM had received information from Incredible Auto in early September 2006.  He said that AAM had not experienced any problems with Incredible Auto in over 100 vehicle transactions during the prior year.  He stated he was not aware that

6

Hyundai had cut off its flooring to Incredible Auto and was not aware of any investigation by Hyundai. He testified that Ex. 9 and 10 were Incredible Auto's bank statements.

Under cross examination, Mr. Pearson testified that he had not had any discussion with Incredible Auto as to when title to the vehicles would pass but that Incredible Auto was free to sell the vehicles when the titles were delivered.

The next witness, Nick Gutierrez, testified that Incredible Auto could sell the vehicles after the auction and upon receiving gate passes and removing the vehicles from auction yard, even if the titles were not available, as the titles would be produced within 30 days. He further testified that if a title was not produced within 30 days Incredible Auto could unwind the auction sale; but he did not agree that if a buyer failed to provide good funds, that AAM could unwind. On rebuttal, Mr. Pearson testified that AAM could unwind an auction transaction if good funds were not provided by the buyer. Mr. Gutierrez further testified that Ex. 9 and 10 were bank statements for Incredible Auto. He testified that he may have known that the bank account balances were significantly in the "red." He stated that the negative balance of approximately $156,000 shown on page 8 of Ex. 9 was the morning balance and that during the day that negative balance would be cleared by the end of the business day. Then under cross examination he testified that he was not sure that the approximate $142,000 negative balance, Ex 9, p. 8, was an ending balance. He further testified that he did not know what the $45,500 check was for made payable to Incredible Auto on Ex. 10, p.5, on October 16. He did testify that Incredible Auto obtained money through the flooring provided by Hyundai to purchase the vehicles and that was why a couple of days would pass from the time of the auction until AAM would deliver the titles and Incredible Auto would issue checks for the purchases.

Ken Cornelison testified that he was familiar with the auction procedures used by AAM. He stated that the buyer would make a bid, and if it was the high bid, then the buyer would sign the "bought ticket," get a gate pass and take possession of vehicle and then when the buyer received the title, the buyer would pay for the vehicle. He further testified that Incredible Auto would not wait for titles but would place vehicles on the sale lot after the shop checked out the vehicles and would try to sell the vehicles as Incredible Auto knew the titles would be forthcoming. He testified that he had not discussed with anyone when legal title passed for the vehicles, but that typically the title passed when payment was made for the vehicle. He admitted that Incredible Auto would sell vehicles without titles as long as it knew the titles were coming. He also testified that he knew of customers of Incredible Auto who bought vehicles with liens on them, although the customer may not know that liens existed.

### CONTENTIONS

AAM contends that its reclamation claims are superior to Hyundai's perfected inventory flooring loan. It further contends that course of performance and course of dealings establish that the auction transactions were never completed as full payment was not made so Hyundai's security interest could never attach. It further contends that Incredible Auto's misconduct, i.e., its knowledge that the proffered checks were worthless, prevented Incredible Auto from obtaining rights in the vehicles. Further it contends that Hyundai did not act in good faith as Hyundai was not merely enforcing its rights but restructuring how it dealt with Incredible Auto.

Hyundai contends that its inventory flooring loan is superior to AAM's reclamation claims. It contends that its security interest attached to the above described vehicles because Incredible Auto obtained rights in the vehicles securing its inventory flooring lien.

8

## DISCUSSION

The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA")

amended 11 U.S.C. § 546(c), effective for cases filed on or after October 17, 2005.  Section

546(c) allows sellers to exercise reclamation rights and provides:

> (1)  . . . subject to the prior rights of a holder of a security interest in such goods or the proceeds thereof, the rights and powers of the trustee . . . are subject to the right of a seller of goods that has sold goods to the debtor, in the ordinary course of such seller's business, to reclaim such goods if the debtor has received such goods while insolvent, within 45 days before the date of the commencement of a case under this title, but such seller may not reclaim such goods unless such seller demands in writing reclamation of such goods –
>
> (A) not later that 45 days after the date of receipt of such goods by the debtor; or
>
> (B) not later than 20 days after the date of commencement of the case, if the 45-day period expires after the commencement of the case.
>
> (2)  If a seller of goods fails to provide notice in the manner described in paragraph (1), the seller still may assert the rights contained in section 503(b)(9).

Significantly, the amended statute changes the time within which a claim may be

demanded by extending the 10-day rule to a 45-day rule; it changes whether an administrative

claim or lien may be granted by the court in the event the court denies such a claim; and it deletes

reference to the statutory or common law right a seller of goods may have in relation to the rights

and powers that a trustee may have.  Judge Randolph J. Haines provides the following insightful

comment:

> The Bankruptcy Code also recognizes the seller's right of reclamation. 11 U.S.C. § 546(c). The Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA")(2005) has amended that provision, effective for cases filed after October 17, 2005. The amended § 546(c) extends the time for making the reclamation demand to 45 days (or 20 days after the commencement of the bankruptcy case). Prior to this amendment, the provision had been understood as

9

"recogniz[ing], in part, the validity of section 2-702 of the U.C.C." H Rep. No. 595, 95th Cong., 1st Sess. 371-72 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 86-87 (1978). But since the U.C.C. still requires a demand within 10 days, perhaps the amended § 546(c) creates its own reclamation right, rather than merely validating the right that exists under the U.C.C. This impression is supported by the fact that the amendment also strikes the reference to "any statutory or common law" right to reclaim, and instead simply states that the trustee's powers are subject to "the right of a seller" to reclaim. If the amended § 546(c) creates its own reclamation right, then the analysis made here by applying the U.C.C. provisions and definitions may not apply in a bankruptcy case filed after BAPCPA's effective date, and the issue may instead be whether the amended Bankruptcy Code provision-"subject to the prior rights of a holder of a security interest in such goods or the proceeds thereof"-applies equally to an unperfected security interest as to a perfected security interest. On the other hand, it may be a mistake to assume that the amended § 546(c) was intended to provide an entirely new and self-contained body of reclamation law, because it fails to recognize the rights of buyers in the ordinary course, other good faith purchasers and lien creditors, who were always protected under the U.C.C. Perhaps the intent was to incorporate and expand on the U.C.C. reclamation rights, rather than to supplant them entirely, in which case some U.C.C. analysis may continue to be relevant in interpreting and applying the new § 546(c).

*Davis v. Par Wholesale Auto, Inc. (In re Tucker)*, 329 B.R. 291, 298, n.8 (Bankr. D. Ariz. 2005).

This Court notes that the House Report for the BAPCPA amendments to 11 U.S.C. § 546(c) does not discuss whether the amendment creates a new bankruptcy reclamation right independent of the reclamation right provided by the Uniform Commercial Code. *See* H. Rep. No. 109-31, pt. 1, 109th Cong., 1st Sess. 146 (2005). Judge Bruce A. Markell, in materials prepared for an ALI-ABA presentation, questions whether a new bankruptcy reclamation right has been created. "Another reading is that Section 546(c) now provides so much detail and gloss on Section 2-702, that it has evolved into a separate right. . . . The existence of a new administrative expense [503 (b)(9)] that expressly covers periods greater than 10 days after receipt takes much of the power away from the reading that creates a new federal right under Section 546(c)." *See* Bruce A. Markell, *Changes to Avoiding Powers Brought about by the Bankruptcy Abuse*

*Prevention and Consumer Protection Act of 2005,* ALI-ABA COURSE OF STUDY, July 21-22,

2005, SL068 ALI-ABA 247.

Irrespective of whether a new bankruptcy right exists, this Court, in order to decide this

case, must focus on the following language "subject to the prior rights of a holder of a security

interest in such goods or proceeds thereof" contained in § 546(c).  All other requirement of 11

U.S.C. § 546(c) have been satisfied as shown by the above stipulated facts.  Even before

BAPCPA, and with rare exception, flooring lenders for businesses with perfected security

interests in pre- and postpetition inventory held superior rights to a seller's reclamation rights

under the Uniform Commercial Code ("UCC") or the bankruptcy code.  The Court looks to State

law to determine the property rights of the respective parties.  *Butner v. U.S.*, 440 U.S. 48, 99

S.Ct. 914 (1979); *Farrey v. Sanderfoot*, 500 U.S. 291, 299, 111 S.Ct. 1825 (1991), *Board of

Trade of City of Chicago v. Johnson* 264 U.S. 1, 10, 44 S.Ct. 232 (1924), *Long v. Bullard*, 117

U.S. 617, 6 S.Ct. 917 (1886).

Under MONTANA CODE ANN. ("MCA") § 30-9A-203, "[a] security interest attaches to

collateral when it becomes enforceable against the debtor with respect to the collateral . . . . [A]

security interest is enforceable against the debtor and third parties with respect to the collateral

only if (a) value has been given; (b) the debtor has rights in the collateral or the power to transfer

rights in the collateral to a secured party; and (c) . . . the debtor has authenticated a security

agreement that provides a description of the collateral . . . ."  In this instance, the issue becomes

whether the debtor has rights in the collateral, as the Court based on the stipulated facts

concludes that value has been given and Debtor has authenticated a security agreement

describing the collateral.  If Incredible Auto has rights in the collateral, all or a portion of the

11

seven cars described in ¶ 12 of the Stipulated Facts ("Stip. Facts"), then Hyundai's flooring security interest will be superior to AAM's reclamation claim.  As noted above in the stipulated facts, Hyundai holds a security interest in all of Incredible Auto's used vehicle inventory.  Stip. Facts ¶ 1. Hyundai is the "floor plan" lender.  Hyundai holds a properly perfected security interest in all inventory of new and used motor vehicles. Stip. Facts ¶ 22.  Without question value under MCA 30-90A-203, has been given.  *See* Stip. Facts ¶¶ 22, 23, 24.  Without question Incredible Auto provided an authenticated security agreement providing a description of the collateral, which was perfected.  Def. Ex. 1-5, Stip. Facts ¶22.

Several U.C.C. provisions assist in the analysis involving whether Incredible Auto acquired rights in the collateral described above as 7 vehicles.  MCA § 30-2-401(2) provides "[u]nless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes performance with reference to the delivery of the goods . . . if the contract requires or authorizes the seller to send the goods to the buyer but does not require the seller to deliver them at destination, title passes to the buyer at the time and place of shipment . . . ." The second provision involving the passing of title is MCA § 30-2-401(3) that provides "[u]nless otherwise explicitly agreed where delivery is to be made without moving the goods, (a) if the seller is to deliver a tangible document of title, title passes at the time when and the place where the seller delivers such document and if the seller is to deliver an electronic document of title, title passes when the sell delivers the document; or (b) if the goods are at the time of contracting already identified and no documents of title are to be delivered, title passes at the time and place of contracting."  "A purchaser of goods acquires all title which his transferor had or had power to transfer . . . ."  MCA § 30-2-403(1).  "A person with voidable title has power to transfer a good

12

title to a good faith purchaser for value.  When goods have been delivered under a transaction of

purchase the purchaser has such power even though . . . the delivery was in exchange for a check

which is later dishonored . . ."  MCA § 30-2-403(1).

What does "explicitly agreed" mean as contained in MCA § 30-2-401(2) and (3)?  Such

terms are not defined in the UCC.  A district court in Texas considering an appeal from a

bankruptcy court provided the following explanation:

> Trade usage is regularly used and accepted to supplement contracts. For example,
> a buyer and seller may control passage of title as between themselves by custom
> and usage in the trade. *Goodpasture, Inc. v. M/V Pollux,* 688 F.2d 1003, 1006 (5th
> Cir.1982), *cert. denied* 460 U.S. 1084, 103 S.Ct. 1775, 76 L.Ed.2d 347 (1983). If
> custom and usage call for ownership to pass only after payment and the
> contracting parties expressly agree to this arrangement, ownership will not pass
> until payment is made.[FN4] *Id.*

> > FN4. This would appear to be a correct reading of *Goodpasture,*
> > which specifically distinguishes the case as being one involving only a
> > buyer and seller "with an explicit agreement regarding passage of title."
> > 688 F.2d at 1006, n. 3. Even if the court's interpretation of *Goodpasture* is
> > incorrect and the Fifth Circuit actually meant that "explicit" also means
> > "implicit," the court's ruling in this case would be the same for the reasons
> > discussed in this section VII.

> Appellant argues that pursuant to industry custom, title to an auctioned vehicle
> does not pass and the sale is not complete until good funds have been paid for the
> vehicle. In this case, however, there is no evidence that the parties "explicitly
> agreed" that title would pass only after payment for the vehicle, *i.e.* that usage of
> trade would be observed. If, indeed, there was an agreement between appellant
> and debtor, that agreement was implied. Both Dinkel and Sanker testified that
> there was no oral agreement; rather, the agreement, if any, was "understood."[FN5]

> > FN5. Lest there be any doubt as to the distinction between explicit
> > and implicit, "explicit" is defined as "characterized by full clear
> > expression: being without vagueness or ambiguity: leaving nothing
> > implied." *Webster's Third New International Dictionary* 801 (1966).
> > "Implicit", on the other hand, means "capable of being understood from
> > something else though unexpressed: capable of being inferred." *Id.* at
> > 1135. Although the Code does not define the term "explicit", courts have

06-00119-RBK   Doc#: 30   Filed: 03/26/07   Entered: 03/26/07 14:45:37   Page 14 of 18

given the term its ordinary meaning. *See Bowman v. American Home Assurance Co.,* 190 Neb. 810, 213 N.W.2d 446 (1973). *See also* U.C.C. § 1-205, comment 3 (1977) (recognizing that a course of dealing may enter an agreement either by explicit provisions of the agreement or by tacit recognition).

*Dinkel Enterprises, Inc. v. Colvin (In re Bailey Pontiac, Inc.)*, 139 B.R. 629, 634 (N.D.Tex. 1992).  In the case *sub judice*, in distinction to the decision rendered in Steve's Auto by this Court except as to the Blazer, Incredible Auto took possession of the above described vehicles, received the titles on all but one vehicle, the Blazer, and tendered checks in payment of the vehicles.  AMM processed 3 checks for the Pontiac, the Ranger, and the Chevy Malibu/Classic, which were returned for not sufficient funds, one check was never tendered for the Blazer, and 3 checks were tendered for the Malibu, the Sebring and the Sorrento but they were never processed given that the other checks were returned for not sufficient funds.  In Steve's Auto's decision, Incredible Auto took possession of 14 vehicles, tendered checks on 3 vehicles, failed to tender checks for 11 vehicles and the lending companies of Steve's Auto held titles for 8 vehicles, and AAM paid Steve's Auto for 6 vehicles.

As determined in the decision on Steve's Auto's motion to modify stay, Memorandum of Decision, *Incredible Auto Sales LLC*, Case No. 06-60855 (Bankr. D. Mont. January 12, 2007), the Court concluded that an explicit agreement altered the general provision of MCA § 30-2-401(2) and the transaction was not complete as the title never passed and the tendering of a check never occurred even though possession passed.  Pearson, in the case *sub judice* testified as to the explicit nature of the agreement and when the transaction was complete.  That testimony was not refuted.  Consequently, AAM is entitled to the proceeds derived from the sale of the Chevy Blazer, more particularly described above.

14

The Court, however, concludes that Hyundai is entitled to all of the proceeds of the other six vehicles.  AAM delivered the titles to Incredible Auto for the remaining vehicles.  Incredible Auto tendered checks for and took possession of those vehicles.  MCA § 30-2-403(1)(b) provides in pertinent part:  "A person with voidable title has power to transfer a good title to a good faith purchaser for value.  When goods have been delivered under a transaction of purchase the purchaser has such power even though . . . the delivery was in exchange for a check which is later dishonored."  Under this provision good faith is defined under MCA 30-2-103(1)(b), "in the case of a merchant . . . [as] honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade."  *See also* 3A ANDERSON ON THE UNIFORM COMMERCIAL CODE § 2-403:34.  A purchaser is defined in MCA § 30-1-201(2)(ee) as one who "takes by purchase" and purchase is defined in MCA § 30-1-201(2)(dd) as "taking by sale, lease, discount, negotiation, mortgage, pledge, lien, security interest . . . or any other voluntary transaction creating an interest in property."  As noted above Hyundai has a prepetition flooring lien on all new and used vehicles acquired by Incredible Auto prepetition and all proceeds received pre- or postpetition, and such effect has not be altered under 11 U.S.C. § 552.  Furthermore, even without funding the purchase of the Sorrento through the inventory flooring loan, Hyundai has a perfected security interest in the Sorrento.  *See* MCA 30-9A-204 and *Daniels-Sheridan F.C.U. v. Bellanger*, 2001 MT 235, ¶ 28, 307 Mont.22, ¶ 28, 36 P.3d 397, ¶ 28.  By statutory definition, the Court concludes that Hyundai is a good faith purchaser for value, with its security interests attaching to pre- and postpetition vehicles and proceeds.

AAM argues that Hyundai did not act in good faith by discontinuing its inventory flooring loan with Incredible Auto for a period of time, which may impact other creditors.  The

15

Court concludes that the evidence in the record fails to establish any lack of good faith on the part of Hyundai. As discussed in *Galey & Lord Inc. v. Arley Corp. (In re Arlco, Inc.)*, 239 B.R. 261, 271 (Bankr. S.D.N.Y. 1999) (a preBAPCPA case),

> . . . the secured creditor with a floating lien remains a good faith purchaser even if it terminates funding with knowledge that sums are owed to third parties, as long as the decision concerning the funding was commercially reasonable. *Samuels,* 526 F.2d at 1244. There is no allegation that the contract obligated CIT to advance any additional funds. The "honesty in fact" element does not require a secured creditor to continue to fund a business with enormous debt and continuous losses. *Id.; Mitsubishi Consumer Electronics America, Inc. v. Steinberg's, Inc. (In re Steinberg's, Inc.),* 226 B.R. 8, 11 (Bankr.S.D.Ohio 1998). Rather, a decision to stop funding such an enterprise is "clearly reasonable." *Samuels,* 526 F.2d at 1244. An entity that advances funds secured by a valid lien on all the borrower's assets is a good faith purchaser absent a showing of misconduct by the secured creditor. *Pillsbury Co. v. FCX, Inc. (In re FCX, Inc.),* 62 B.R. 315, 320 (Bankr.E.D.N.C.1986). The burden is on the reclaiming seller to show misconduct by the secured creditor. *FCX, Inc.,* 62 B.R. at 322. Some courts have framed the issue as an absence of bad faith. *Victory Markets,* 212 B.R. at 742 (citing cases). Others as the secured creditor's lack of good faith. *Steinberg's Inc.,* 226 B.R. at 11 (citing cases). Under any formulation, the reclaiming seller bears the burden of proof under § 546(c). *Id.; Victory Markets,* 212 B.R. at 741.

AAM introduced no evidence that Hyundai was required on the flooring loan to continue advancing additional funds when through its investigation it discovered business improprieties by Incredible Auto. Hyundai pursued its remedies under the flooring loan. No misconduct by Hyundai appears in the evidence before this Court.

Lastly, AAM argues that Incredible Auto's misconduct prevented the auto auction sales from becoming final. As in *Dinkle*, AAM has not presented evidence sufficient to establish actionable fraud under the required elements. In looking at Plaintiff's Ex. 10 and at Defendant's Ex. 6, Incredible Auto tendered checks for vehicles that were processed and not returned for not sufficient funds. As an example, on October 2, 2006, Hyundai funded Incredible Auto for a Ford

16

Five Hundred for $13,000.00.  Incredible Auto purchased that car for $13,000, with a check, no. 73165, that was debited to the account on October 5, 2006.  Although ultimately personnel for Incredible Auto contacted AAM and informed it not to deposit any additional checks until Incredible Auto could work out its financial problems, no evidence exists in the record on the above 6 vehicle transactions that personnel for Incredible Auto knew when it tendered its checks that insufficient funds would prevent the bank from processing the checks tender to AAM and subsequently deposited by AAM.

The Court, based upon the evidence, concludes that Hyundai acted with honesty in fact, in good faith and with the observance of reasonable commercial standards of fair dealing.  The Court further concludes that Incredible Auto did not through actionable fraud tender checks to AAM and know at the time of tender that such checks would be returned for not sufficient funds.

Based upon the foregoing discussion and analysis, and for cause, the Court will issue a separate order and separate judgment providing as follows:

IT IS ORDERED that Judgment is entered in part and in favor of Plaintiff AAM and against Defendant Hyundai as follows concerning the distribution of certain identified proceeds; that Judgement is entered in part and in favor of Defendant Hyundai and against Plaintiff AAM as follows concerning the distribution of certain identified proceeds; that Plaintiff AAM is entitled to recover the proceeds derived from the sale of the 2004 Chevy Blazer, VIN # 1GNDT13X74K163169; that Defendant Hyundai is entitled to recover the proceeds derived from the sale of the following 6 vehicles:  a 2005 Pontiac Montana, VIN # 1GMDV23E75D121917 ($9,150); a 2004 Ford Ranger, VIN # 1FTZR44E34PA07225 ($8,050); a 2005 Chevy Malibu/Classic, VIN # 1G1ND52F75M177176 ($6,850); a 2003 Chevy Malibu, VIN #

1G1ND52J93M699843 ($5,350); a 2005 Chrysler Sebring, VIN # 1C3EL46X35N568587

($7,900); and a 2006 Kia Sorrento, VIN # KNDJC733565573207 ($13,200), and that the holder

of the above identified proceeds is directed to remit such proceeds to either AAM or Hyundai as

referenced above upon this Order and separate Judgment becoming final.

                              BY THE COURT

                              HON. RALPH B. KIRSCHER
                              U.S. Bankruptcy Judge
                              United States Bankruptcy Court
                              District of Montana